# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DAVID BENHAM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No. 11-CV-339-JED-FHM |
| | ) |
| OZARK MATERIALS RIVER ROCK, LLC, | ) |
| | ) |
| Defendant. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, David Benham, filed this citizen suit seeking injunctive relief and civil penalties under §§ 402 and 404 of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA"). Benham claims that defendant Ozark Materials River Rock, LLC's mining activities along Saline Creek have adversely affected the environmental health of the creek and surrounding land. On September 24, 2013, the Court dismissed Benham's § 402 claim as moot. (Doc. 122). On April 29 and 30, 2014, a nonjury trial was held on Benham's § 404 claim. Having considered the evidence and the parties' submissions, the Court hereby enters its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.[1]

**I. Findings of Fact[2]**

1. As noted, this is an action seeking injunctive relief and civil penalties pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA"), alleging discharges of

---

[1] At trial, Benham was given leave to submit the affidavit of Steven Stough as an evidentiary supplement to that which was received at trial. That submission was received on May 30, 2014. (Doc. 157). On June 27, 2014, the parties submitted their respective proposed findings of fact and conclusions of law. (Docs. 158 and 159).

[2] Any conclusion of law more appropriately characterized as a finding of fact shall be incorporated herein.

dredge and fill material into Saline Creek and its surrounding wetlands in Mayes County, Oklahoma. (*See* Complaint, Doc. 2 at ¶44).

2. Saline Creek has been designated as a "High Quality Water" by the Oklahoma Water Resources Board and serves as a reference stream for the State of Oklahoma. (Transcript ("Tr.") at 117:17-18; 229:8-16).

**Plaintiff Benham's Relationship to Saline Creek**

3. Plaintiff David Benham grew up on property along Saline Creek and spent a significant amount of his youth swimming, hunting, fishing, and otherwise recreating in and alongside the creek. (Tr. at 221:17 – 222:1). Benham testified that he continues to recreate in Saline Creek, but that Ozark's operations have degraded his ability to do so. (Tr. at 229:22 – 230:12). For example, he stated that the creek is shallower and slower and that wildlife such as minnows and crawdads are scarcer. (Tr. 230:18 – 231:3). Benham also testified that the number of areas deep enough for swimming in the creek has been severely reduced. (Tr. at 236:16-22).

4. Benham also testified about Saline Creek's importance to the local Cherokee culture. The confluence of Big Saline and Little Saline, which becomes Saline Creek, harbored two giant American Elm trees that the Cherokees had historically used for cultural rituals. (Tr. 235:22 – 236:8). The erosion of the creek has washed out one of the elms and left the other "half alive." (Tr. at 236:10-13).

5. Benham intends to recreate in Saline Creek in the future. (Tr. at 239:20-22).

**Ozark's Mining Operation**

6. Defendant Ozark Materials River Rock, LLC ("Ozark") is a sand and gravel mining company that operates on property adjacent to Saline Creek. (Tr. at 20:8-22). Ozark's gravel mining operation is located in Section 30, Township 21 North, Range 21 East, Mayes

County, Oklahoma. (Pretrial Order, Doc. 139 at 2). Ozark dredges sand and gravel from the bed of Saline Creek and processes the materials through a screening plant on site, washing and separating the materials for marketing. (Tr. at 21:24 – 22:12).

7. Brad Eastman is the chief executive of Ozark. (Tr. at 20:8-10). Eastman testified that Ozark took over a pre-existing mining operation in September 1991 and that excavation had taken place in the same or similar locations under the previous ownership. (Tr. at 268:1-13).

8. Ozark operates under a non-coal mining permit issued by the Oklahoma Department of Mines. (Defendant's Exhibits 21 and 22).

9. Ozark does not currently have an individual Section 404 permit, but did at some point "[a] long time ago." (Tr. at 30:9-13). Mr. Eastman testified that he was told by the Army Corps of Engineers ("ACOE") that he did not need such a permit. (Tr. at 30:9-13). A letter regarding a Section 404 violation on the part of Ozark issued by the ACOE dated March 2, 2005, suggests, but does not explicitly state, that Ozark did not have a permit at that time. (Defendant's Exhibit 19).

**The Notice Letter**

10. On or about March 8, 2011, Ozark was served with a Notice of Intent to Sue (the "Notice Letter") from Benham, pursuant to Section 505 of the CWA. (Pretrial Order, Doc. 139 at 2).

11. With respect to Benham's Section 404 claim, the Notice Letter stated as follows:

Discharges of dredged or fill material into waters of the United States may only occur if permitted by the Army Corps of Engineers (herein the "ACOE"). 33 U.S.C. § 1311(a); 33 U.S.C. § 1344(a). Waters of the United States, as defined in section 404, includes wetlands, which are areas "inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b); *see also U.S. v. Riverside Bayview Homes*, 474 U.S. 121, 131-32 & n. 8 (1985). Saline Creek is surrounded

3

by wetlands. A significant portion of your mining operations have both dredged and filled these designated wetlands. *See* Attachment 2. The ACOE has no record of you being issued a section 404 permit for these dredge and fill activities.

Any action which results in the filling of waters of the United States, including wetlands such as the ones you have filled, must be permitted through the ACOE. 33 U.S.C. 1311(a); 33 U.S.C. 1342. You have violated this section by placing large amounts of dirt, sand, and gravel in to the center of Saline Creek without a permit in order to form a more convenient access road for its trucks. This road stretches underneath the S 4437 road and connects land owned by the Grand River Dam Authority with land owned by you. The attached photograph shows you filling this wetland on September 14, 2006. *See* Attachment 3. The location of your illegal discharges of fill material is identified on the attached air photo at approximately the point labeled "1". *See* Attachment 2. It is believed that you have discharged fill materials in numerous other areas along Saline Creek, but because of the secretive nature in which you conduct your business, those violations have been difficult to document. To the extent such documentation can be found, Mr. Benham intends to amend this notice so as to include those additional violations.

Additionally, it is believed that situs for the current washing and sorting site is a wetland. Thus, you currently are and have been engaging in sidecasting, which is the deposit of dredged or excavated material from a wetland into a different area of the same wetland. Sidecasting has been held to be a discharge of a pollutant that violates section 404 of the CWA. *See U.S. v. Deaton*, 209 F.3d 331, 332-333 (4th Cir. 2000). The location of your illegal discharges is identified on the attached air photo at approximately the point labeled "3". *See* Attachment 2. These activities began on or around May 15, 2010 and occur each time you excavate gravel from the stream and dump it in your washing and sorting site.

Moreover, it is believed that your previous washing and sorting site (located on land leased from the Grand River Dam Authority) was in a wetland. Such sidecasting activities occurred from approximately July 1, 2005 to May 15, 2010. The location of your illegal discharges is identified on the attached air photo at approximately the point labeled "4". *See* Attachment 2.

(Plaintiff's Exhibit 1 at 5-6).[3]

12. The Court finds that the Notice Letter put Ozark on notice that it was being accused of having discharged dredge and fill material into Saline Creek and its surrounding wetlands in violation of Section 404.

---

[3] Benham has abandoned the allegations in the Notice Letter with respect to the current and former washing and sorting sites being wetlands. (Doc. 159 at 3 n.1).

13. Following receipt of the Notice Letter, Ozark consulted with the ACOE. (Plaintiff's Exhibit 32). ACOE Regulatory Program Manager Ed Parisotto made a record of his April 4, 2011 conversation with Randall Beeson, Ozark's environmental consultant, and Ozark's legal counsel, which notes that "[i]t was suggested that Mr. Eastman hire an environmental professional/ consultant to perform a wetland delineation to establish, in fact, if any jurisdictional wetlands or waters are located on the property and if so, their boundaries and possible impacts." (Plaintiff's Exhibit 32 at 2).

14. Following service of the Notice Letter, Benham timely filed this lawsuit on June 1, 2011. (Pretrial Order, Doc. 139 at 2).

## Ozark's Engagement of Enercon Services, Inc.

15. After Ozark's meeting with the ACOE, Ozark engaged Enercon Services, Inc. ("Enercon") to perform a Section 404 impact analysis. (Tr. at 37:1-6; Plaintiff's Exhibit 38). On October 17, 2011, Enercon provided Ozark with its "Analysis of Project Impacts, Section 404 Permit Application, and Preliminary Compensatory Mitigation Plan" (the "Mitigation Plan"). (Plaintiff's Exhibit 38). Enercon's Mitigation Plan noted that Ozark's operations had "affected likely jurisdictional wetlands and a perennial stream (Saline Creek) within the [Ozark] property." (Plaintiff's Exhibit 38 at 1). Enercon's Mitigation Plan proscribed restoration of wetlands and stream areas that were "degraded or altered" as a result of Ozark's operations. (*Id.*)

16. In connection with its Mitigation Plan, Enercon performed a wetlands delineation and generated a site map that shows aerial footage of Saline Creek and Ozark's area of operation. The aerial photograph contains an overlay depicting "Existing Wetlands" and "Filled Wetlands." (Plaintiff's Exhibit 17). The site map indicates four areas of "Filled Wetlands" totaling .58 of an acre. (*Id.*).

17. Enercon also created a document titled "Delineation of Potential Section 404 Issues" (the "Delineation"), dated November 1, 2011, which was provided to the ACOE. (Plaintiff's Exhibit 33; Tr. at 53:12-20).[4] The Delineation identified four areas that the ACOE would likely deem jurisdictional wetlands. (Plaintiff's Exhibit 33). Specifically, the Delineation stated that "[a]pproximately 0.46 acre of Section 404 technical wetlands were identified within the area of delineation." (*Id.* at 4).

18. Enercon's Delineation does not make reference to the .58 acre of "Filled Wetlands" that appears in the site map created for Ozark, nor is that site map included in the materials provided to the ACOE. (*See* Plaintiff's Exhibit 33). The areas depicted as filled wetlands in the site map created for Ozark (Plaintiff's Exhibit 17) are conspicuously absent from the site map contained in the Delineation. (*Compare* Plaintiff's Exhibit 17 *with* Plaintiff's Exhibit 33 at Figure 3, Bates-labeled Benham 002565). As such, the ACOE was never informed of the .58 acre of filled wetlands that Enercon had identified and Parisotto testified that he had never seen the site map depicting the filled wetlands. (Tr. at 57:16-19; 59:16-17). In fact, the Enercon Delineation provided to the ACOE contains no reference whatsoever to any wetlands having been filled or degraded. (*See* Plaintiff's Exhibit 33).

**The Army Corps of Engineers' Actions with Respect to Ozark**

19. The ACOE did not perform a wetlands delineation of any kind with respect to the Ozark mining site despite being asked to do so by Enercon. (Tr. at 58:22 – 59:15; 104:10-23).

20. The evidence at trial indicated that five site visits were made by the ACOE to the Ozark mining operation from 2010-on. The ACOE's April 4, 2011 Record of Conversation (Defendant's Exhibit 9) indicates that field inspections were made on June 17, June 29, and

---

[4] The ACOE refers to such delineations as "preliminary jurisdictional determinations" because they remain preliminary until the ACOE formally approves them. (Tr. at 52:21 – 53:11).

October 6 of 2010. The ACOE created a record of field inspection for the October 6, 2010 inspection and for inspections which occurred on June 28, 2012, and July 3, 2013. (Defendant's Exhibits 5, 6, and 7).

21. The ACOE's three records of field inspections are very similar. They note that each inspection was performed by Parisotto and consisted of him driving through the property and viewing the area where recent excavation activity had occurred. (*See* Defendant's Exhibits 5, 6, and 7). Each inspection concluded that "[i]ncidental fall back of gravel" was present in the area, but found no CWA violation. (*See* Defendant's Exhibit 5 at 2; Defendant's Exhibit 6 at 1-2; and Defendant's Exhibit 7 at 2).

22. Parisotto did not testify as an expert witness. (Tr. 97:19-24). When testifying about the October 6, 2010 site visit, he was clear that his inspection did not occur while excavation was taking place and agreed that, as such, he could not have witnessed "any placement of dredge or fill material" at that time. (Tr. at 98:17-23). It is unclear from the record whether excavation was taking place during his June 28, 2012 and July 3, 2013 visits.

23. The referenced 2012 and 2013 records of field inspections include photographs taken by Parisotto. It is unclear the extent to which the 2012 photographs include areas identified by Enercon as potential wetlands or filled wetlands. (*See* Defendant's Exhibit 6). The 2013 photographs reference the "[a]reas identified by Enercon Services within the November 1, 2011 Preliminary Jurisdictional Determination as possible 'wetland areas.'" (Defendant's Exhibit 7 at 3). The report notes that the areas "seem to be functioning well." (*Id*.). Parisotto testified that he "found no evidence of the placement of dredge or fill material" in those areas. (Tr. at 83:24 – 84:3). As noted, however, Parisotto also testified that he had not seen the areas identified by

Enercon as *filled* wetlands until presented with Plaintiff's Exhibit 17 at trial. (Tr. at 57:16-19; 59:16-17).

### Dr. Patterson's Testimony Regarding Saline Creek and its Surrounding Wetlands

24. Dr. Steve Patterson testified as an expert witness on behalf of Benham.

25. The Court finds that Dr. Patterson is qualified as an expert in his field of restoration ecology, and his testimony has materially assisted the Court in reaching its decision. Ozark had no objection to Dr. Patterson's admission as an expert. (Tr. at 112:15-16).

26. Dr. Patterson performed a wetlands delineation with respect to Ozark's mining site and the respective area of Saline Creek. (Plaintiff's Exhibit 58). He examined the areas previously identified by Enercon as wetlands that had not been filled (*see* Plaintiff's Exhibit 33) and used those areas as a reference for comparison purposes. (Plaintiff's Exhibit 58).

27. Dr. Patterson modified the delineations of the wetlands identified by Enercon as W-1, W-2, W-3, and W-4, finding that W-1 consisted of .2 acres, W-2 consisted of .51 acres, W-3 consisted of .25 acres, and W-4 was no longer existent as a result of the expansion of an open water pond. (Tr. 139:20-22; 163:1 – 166:25; *also compare* Plaintiff's Exhibit 58 at 9 *with* Plaintiff's Exhibit 33 at 5).

28. Dr. Patterson observed discharge of fill material into W-1 in "[m]ultiple locations" (Tr. at 145:22 – 147:6); "[i]n various locations along the perimeter" and in chunks throughout W-2 (Tr. at 152:15-22); and recently deposited fill material along the "whole northern edge" of W-3 (Tr. at 154:20 – 155:11). He stated that these discharges of fill material were such that they would probably not be seen if one were merely driving through the mining site, as the ACOE's records state Parisotto did. (Tr. at 143:21 – 144:1).

29. Dr. Patterson also opined about significant impacts of the Ozark mining site in the form of loss of riparian and wetland vegetation and reduction in linear feet of the stream channel. (*See* Plaintiff's Exhibit 58; Tr. at 169:17 – 175:3). These harms were not specifically referenced in Benham's Notice Letter. (*See* Plaintiff's Exhibit 1).

30. Dr. Patterson concluded that more than one-half acre of wetlands contained discharges of fill material and was otherwise disturbed, *i.e.*, earth having been moved and vegetation removed, by Ozark's mining activities. (Tr. 167:24 – 168:17).

31. Ozark did not present an expert in opposition to Benham's Section 404 claim.[5]

32. Benham's Section 404 claim asserts that the roadway from which Ozark's mining activities were, in part, conducted is, in itself, a violation of the CWA because Ozark placed dredge and fill material within Saline Creek to create the roadway. (*See* Doc. 2; Plaintiff's Exhibit 1 at 5). The road at issue stretches under S 4437 road (referred to as the "pumpback road" at trial) and connects land owned by the Grand River Dam Authority ("GRDA") with land owned by Ozark. (Plaintiff's Exhibit 1 at 5).

33. There was conflicting testimony at trial with respect to the construction of this roadway. Mr. Eastman testified that Ozark did not create the road and that it was constructed before he purchased the mining operation in 1991. (Tr. at 269:6-13). Eastman further stated that it was his belief that the GRDA had created the road. (Tr. at 277:11-16).

34. In contrast, Benham testified that he observed the road's construction in the years that followed Ozark's commencement of operations on the property in 1991. (Tr. at 224:7-24). He estimated that construction of the road began around 2005. (Tr. at 226:24 – 227:5). Benham

---

[5] Ozark elected to withdraw the expert it had identified, Randall Beeson, upon plaintiff's agreement that he would not call Mr. Beeson as a witness in his case-in-chief. (Tr. at 209:24-210:1).

stated that the road was constructed in small increments so that gravel could be mined in the adjacent area of Saline Creek, and when the area was exhausted, new gravel would be placed in the creek to extend the road further. (Tr. at 224:12-24).

35. Benham was permitted at trial to submit a post-trial affidavit of a GRDA official because of difficulties in securing his attendance at trial as a rebuttal witness. (*See* page 1, footnote 1). Steve Strough, Superintendent of Field Construction and Excavation for the GRDA, has been involved in all field construction and excavation activities in and around Saline Creek since April 1989. (Doc. 157-1). Strough attested that he is familiar with the road at issue and that the GRDA *did not build the road* and does not maintain it, but that he has observed Ozark employees maintaining, rebuilding, and driving on the road. (*Id*. at 2). This stands in contrast to Eastman's testimony that he believed GRDA had constructed the road. (*See* Tr. at 277:11-16).

36. The aerial photographs of the mining site produced during trial appear to support Benham's testimony that the road was constructed after Ozark took over operations at the site. In Plaintiff's Exhibit 22, a photograph taken on October 6, 2006, the road is clearly present, whereas in Plaintiff's Exhibit 24, taken on March 31, 1991, the road does not appear to be present, though the photograph is low resolution and monochromatic. (*Compare* Plaintiff's Exhibits 22 and 24).

37. Based upon the foregoing, the Court accepts Benham's version of events with respect to construction of the road. Eastman's testimony that Ozark did not construct the road was not credible in light of Benham's detailed testimony regarding how Ozark constructed the road; Plaintiff's Exhibit 24, which shows that the road was not present in 1991; and the GRDA testimony that GRDA did not construct the road. In addition, Eastman's testimony was often

evasive and suffered from a lack of recollection as to key issues. Accordingly, the Court finds that Ozark constructed the road by placing dredge and fill material into Saline Creek.

38. The Court also finds that Ozark has discharged dredge and fill materials into Saline Creek in excess of one-half of an acre without an individual permit as required under the CWA.[6] Dr. Patterson's testimony and the records regarding the existence of filled wetlands created by Enercon establish that the half-acre threshold for filled wetlands requiring an individual permit has been surpassed. While Mr. Parisotto testified that he did not observe wetlands containing dredge and fill material, he was not privy to Enercon's findings in that respect and the record does not establish that his inspections were performed with the same rigor as that of Dr. Patterson's and Enercon's investigations. Moreover, Parisotto did not perform a wetlands delineation, but delineations were performed by both Dr. Patterson and Enercon.

### Factors Relevant to Civil Penalties

39. Ozark's mining operation had a gross income of $1,670,411 between 2007 and 2012. This number being the total for reported incomes of $292,920 in 2007; $351,781 in 2008; $203,926 in 2009; $240,373 in 2010; $289,813 in 2011; and $291,598 in 2012. (Plaintiff's Exhibits 42-47).

40. Dr. Patterson estimated the costs of restoration of the filled wetlands to be $7,500 for wetland creation and $5,000 for wetland enhancement. (Plaintiff's Exhibit 58). No estimate was given with respect to remediation of the roadway constructed within Saline Creek.

---

[6] As will be discussed fully in the Conclusions of Law, the ACOE nationwide permit for non-coal mining permits up to one-half acre of impact to wetlands before an individual permit is required. (*See infra* Conclusions of Law, paragraph 8).

41. Ozark was aware that it was in violation of the CWA as a result of Enercon's report dated October 17, 2011, in which CWA violations are identified and a mitigation plan is proposed, but did not provide this information to the ACOE. (Plaintiff's Exhibit 38).

42. Ozark has been found to be in violation of the CWA previously by the ACOE on March 2, 2005. (Defendant's Exhibit 19). Specifically, the ACOE found that Ozark's operations resulted in the placement of dredge and fill material within the jurisdictional limits of Saline Creek. (*Id.*).

## II. Conclusions of Law[7]

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), as this action arises under the Clean Water Act, 33 U.S.C. 1251 *et seq*.

2. Venue is proper under 33 U.S.C. § 1365 because the complained of violations occurred within the Northern District of Oklahoma.

3. The Court has determined that Benham has standing to maintain this action and the facts elicited at trial reinforce the Court's prior conclusion. (*See* Doc. 122).

4. Under Section 1365 of the CWA, "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title." *Id.* at § 1365(a).

5. The Clean Water Act is a pollution control statute that establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA prohibits

---

[7] Any finding of fact more appropriately characterized as a conclusion of law shall be incorporated herein.

the discharge of pollutants, including dredged or fill material, into navigable waters unless authorized by a CWA permit. 33 U.S.C. § 1311(a); 33 U.S.C. § 1362(6) (listing rock and sand, among other things, as pollutants under the CWA).

6. The CWA defines "navigable waters" as "waters of the United States," which term, in turn, is defined by regulation to include certain wetlands. 33 U.S.C. § 1362(7); 33 C.F.R. § 328.3(a)-(b). "The phrase 'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] ... oceans, rivers, [and] lakes.'" *Rapanos v. United States*, 547 U.S. 715, 739 (2006) (alteration in original). Wetlands are covered by the CWA "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780 (Kennedy, J., concurring).

7. Section 404 of the CWA authorizes the ACOE to regulate discharges of dredge and fill material into navigable waters through the issuance of permits. 33 U.S.C. § 1344. The ACOE may issue either individual permits on a case-by-case basis, or general permits for "categories of activities" on a state, regional, or nationwide basis. *Id.*

8. Effective June 5, 2000, the ACOE created a nationwide permit for mining activities, Nationwide Permit No. 44, which covers mining activities that do not disturb more than one-half acre of wetland or 300 linear feet of stream bed. *See* Final Notice of Issuance and Modification of Nationwide Permits, 65 Fed. Reg. 12818-01. Mining activity which exceeds these limits requires an individual permit under Section 404.

9. Until a pollutant, such as fill material, that has been placed in a wetland is removed, its presence constitutes a continuing violation. *Sasser v. Adm'r, U.S. E.P.A.*, 990 F.2d

127, 129 (4th Cir. 1993) (citing *United States v. Ciampitti*, 669 F. Supp. 684, 700 (D.N.J. 1987); *United States v. Cumberland Farms*, 647 F. Supp. 1166, 1183-84 (D. Mass. 1986), *aff'd* 826 F.2d 1151 (1st Cir.1987)); *see also United States v. Reaves*, 923 F. Supp. 1530, 1534 (M.D. Fla. 1996) ("discharge of dredged or fill materials into wetlands on the site is a continuing violation for as long as the fill remains").

10. Under Section 404, notice must be given to violators before a citizen suit can be commenced. The notice must provide "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, [and] the date or dates of such violation." *Karr v. Hefner*, 475 F.3d 1192, 1200 (10th Cir. 2007) (quoting 40 C.F.R. § 135.3(a)). "The guiding principle is that the purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit." *Id*. (internal quotations omitted).

11. The Court finds that Saline creek and its surrounding wetlands are "waters of the United States" subject to regulation under the CWA.

12. The Court finds that Ozark's deposition of dredge and fill material in excess of the one-half acre limit permitted under Nationwide Permit No. 44 constitutes a continuing violation of Section 404 of the CWA that renders Ozark subject to liability. Specifically, the Court finds that the roadway constructed within Saline Creek and the filling of wetlands

identified by Enercon in Plaintiff's Exhibit 17 and by Dr. Patterson constitute Section 404 violations committed by Ozark.[8]

13. The Court finds that Ozark was required to have an individual Section 404 permit as a result of these discharges, but did not and did not apply for one.

14. The Court finds that plaintiff's allegations regarding loss of linear feet of stream channel and riparian vegetation (*see supra* Findings of Fact) are beyond the scope of the Notice Letter. Plaintiff's allegations regarding the roadway within Saline Creek and the filling of its surrounding wetlands are within the scope of the Notice Letter. The destruction of wetland vegetation is implicit in plaintiff's allegations regarding the filling of wetlands and is therefore within the scope of the Notice Letter.

15. Plaintiff seeks injunctive relief and civil penalties as a result of Ozark's Section 404 violations.

16. The restoration of unlawfully filled wetlands is an available type of injunctive relief contemplated by the CWA. 33 U.S.C. § 1319. "Courts have recognized a mandatory duty to restore intentionally filled wetlands, unless the equities weigh against restoration." *United States v. Donovan*, 466 F. Supp. 2d 595, 598 (D. Del. 2006) (citing *United States v. Cumberland Farms*, 826 F.2d 1151, 1161-65 (1st Cir. 1987), *cert. denied*, 484 U.S. 1061 (1988); *United States v. Van Leuzen*, 816 F. Supp. 1171, 1180 (S.D. Tex. 1993)). When evaluating the propriety of ordering restoration, three factors are generally considered: "(1) whether the proposal will

---

[8] Ozark objected to the admission of Plaintiff's Exhibit 17 at trial, which the Court overruled at that time. (Tr. at 57:1-14). No objection was raised to the admission of this exhibit in the proposed pretrial order and Ozark therefore waived the right to object to its admission at trial. *See* Fed. R. Civ. P. 26(a)(3)(B) ("An objection not so made—except for one under Federal Rule of Evidence 402 or 403—is waived unless excused by the court for good cause."). Ozark has not demonstrated good cause for its failure to timely object and the exhibit is not excludable under Rules 402 or 403.

confer the maximum environmental benefits, (2) whether the proposal is achievable as a practical matter, and (3) whether the proposal bears an equitable relationship to the degree and kind of wrong it is intended to remedy." *Id.* (citing *United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003)).

17. Taking these factors into consideration, the Court finds that restoration should be and is hereby ordered. The extent of such restoration will be determined upon the filing of a proposed restoration plan by Ozark.

18. Ozark shall file its proposed restoration plan within 60 days of the date of this Opinion and Order. Such proposal shall take into account the three factors cited above: maximum environmental benefit, achievability of the proposal, and equities of restoration.

19. Benham shall submit its response to the proposed restoration plan within 30 days of the date that Ozark's plan is filed.

20. The parties have had significant difficulties in reaching consensus on issues throughout this litigation. Nevertheless, the Court directs the parties to confer with respect to a potential joint restoration plan that can be carried out more expeditiously and economically without the need for further disputes over issues that have now been determined by the Court.

21. The Court will thereafter determine an appropriate course of action with respect to restoration of the areas subject to the Section 404 violations.

22. The CWA also provides for civil penalties "not to exceed $25,000 per day for each violation." 33 U.S.C. § 1319. The Act provides:

> In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

*Id*.

23. Benham seeks civil penalties in the amount of $2,573,750, which represents the alleged avoidance of $1,029,500 in compliance costs multiplied by 2.5, on the basis that Ozark concealed evidence of its impacts to wetlands from the ACOE. Penalties within this range would be excessive and are rejected.

24. However, taking into account these factors and the Court's Findings of Fact with respect to Ozark's actions, the Court finds that imposition of a civil penalty is warranted in this case in the amount of $35,000. This penalty is appropriate in light of Ozark's modest annual gross revenue and its level of culpability with respect to concealment of its violations.

**SO ORDERED** this 16th day of January, 2015.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE